

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 18, 2017 at Knoxville

## STATE OF TENNESSEE v. TOMMY LEE COLLINS, JR.

**Appeal from the Circuit Court for Bedford County**
**No. 13-CR-17817    F. Lee Russell, Judge**

_____

**No.  M2015-01030-CCA-R3-CD**

_____

The Defendant, Tommy Lee Collins, Jr., was convicted by a Bedford County Circuit Court jury of employing a firearm during the commission of a dangerous felony, a Class C felony, evading arrest, a Class D felony, and reckless endangerment, possession of marijuana with the intent to sell, and possession of marijuana with the intent to deliver, Class E felonies.  *See* T.C.A. §§ 39-17-1324 (2014) (employing a firearm during the commission of a dangerous felony), 39-16-603 (2014) (amended 2016) (evading arrest), 39-13-103 (Supp. 2012) (amended 2013) (reckless endangerment), 39-17-417(a)(4) (Supp. 2012) (amended 2014) (possession of a controlled substance). The trial court merged the possession of marijuana convictions and sentenced the Defendant to an effective eight years.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his drug and firearm convictions, (2) the trial court erred by denying his motion to suppress evidence obtained as a result of the traffic stop and subsequent search of the car he was driving, (3) the prosecutor improperly challenged a juror on the basis of race, (4) the trial court erred by declining to order the prosecutor to disclose the identity of a confidential informant, and (5) the Defendant's dual convictions for reckless endangerment and evading arrest violated double jeopardy principles. Because we conclude a juror was improperly challenged, we reverse the judgments of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

David Harris (on appeal) and Stephanie Pirera (at sentencing and motion for new trial), Nashville, Tennessee, and Harold E. Dorsey (at trial), Alamo, Tennessee, for the appellant, Tommy Lee Collins, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Robert Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises because of a tip from a confidential informant about the planned sale of marijuana, which led members of the Seventeenth Judicial Drug Task Force to attempt to initiate a traffic stop of a car driven by the Defendant. The Defendant led officers on an eleven-mile, high-speed chase involving multiple near-collisions with police cruisers and one civilian vehicle. The chase began on Bottle Hollow Road, spanned a section of State Highway 82, and ended inside the Shelbyville city limits. After the car was stopped and the Defendant arrested, a backpack containing a loaded pistol and marijuana was recovered from the front passenger floorboard.

### *Suppression Hearing*

Bedford County Sheriff's Deputy and Assistant Director of the Seventeenth Judicial Drug Task Force Timothy Miller testified that he had received multiple tips concerning a man who drove a silver four-door Jaguar and distributed marijuana at a specific residential area. Deputy Miller stated that he went to the residential area multiple times, that he saw the Jaguar, and that the Jaguar was registered to Jordan Beales. Deputy Miller said that on May 16, 2013, a confidential informant told him that the informant had been in contact with Christina Long, a person from whom the informant had previously bought marijuana. The informant told Deputy Miller that on multiple occasions, the informant had ordered one-half pound of marijuana and that Ms. Long had called her "source." The informant told Deputy Miller that he had gone to Ms. Long's house and waited for her source to arrive. The informant said that an African-American man driving a silver Jaguar would arrive, that Ms. Long would take marijuana from the man and give it to the informant, and that the informant would give money to Ms. Long to give to the man. The informant stated that he did not know the man's name.

Deputy Miller testified that based on this information, he authorized the informant to order one-half pound of marijuana from Ms. Long. Deputy Miller stated that the informant told him the man driving the silver Jaguar was expected at Ms. Long's house during the evening hours on May 16. Deputy Miller said that the informant had previously provided information to the police between ten and twenty times, that the informant had made successful controlled drug purchases on behalf of Bedford County law enforcement and other Tennessee agencies, and that large quantities of drugs had been obtained as a result of the informant's cooperation. Deputy Miller stated that he had found the informant reliable.

Defense counsel interjected and stated, "Your Honor, his reliability is not at issue at all. I understand that." The prosecutor responded that he used reliability to establish probable cause for the search of the car and that he accepted counsel's stipulation as to the informant's reliability.

Deputy Miller testified that he and other officers set up surveillance on both ends of the road on which Ms. Long lived, that Ms. Long drove past them, that Agent Shane George stopped her car, and that Deputy Miller stopped behind them. Deputy Miller said that before he had an opportunity to speak to Ms. Long, he saw an African-American man in a silver Jaguar drive past them. Deputy Miller stated that he attempted to stop the Jaguar by activating his blue lights, that the Jaguar did not stop, and that the driver led the police on an eleven-mile chase toward Shelbyville.

Defense counsel again interjected and stated the defense was only "contesting the stop." Deputy Miller stated that the Defendant was removed from the Jaguar, that the Jaguar was searched, and that a maroon bag with a "large quantity" of marijuana and a loaded gun was found on the front passenger floorboard.

On cross-examination, Deputy Miller testified that his supervisor at the Drug Task Force received a "handful" of anonymous tips about the silver Jaguar. Deputy Miller agreed that he did not personally listen to the tips. He said that he saw the Jaguar in the residential area between five and ten times before May 16. He stated that he was told a man was selling marijuana at the residential area and was given a description of the Jaguar. He agreed that he was not told the basis of information supporting the anonymous tips. Deputy Miller said that he did not see any indications of criminal activity when he saw the Jaguar at the residential area, that he did not see Mr. Beales or the Defendant. Deputy Miller stated that after May 16, either the Defendant or Maury County "authorities" who had interviewed Mr. Beales told Deputy Miller the Defendant had borrowed the Jaguar from Mr. Beales or was in the process of buying it from him. Deputy Miller agreed that before May 16, he did not know the Defendant was connected to the Jaguar.

Deputy Miller testified that the confidential informant purchased drugs from Ms. Long, that the informant had been to Ms. Long's house multiple times, that the informant usually purchased between one-quarter and one-half pound of marijuana, and that every time the informant had purchased marijuana, Ms. Long's supplier had been an African-American man driving a four-door Jaguar. Deputy Miller said the informant told him that Ms. Long took the drugs and gave the supplier the informant's money. Deputy Miller did not know where the informant stood during the transactions. Deputy Miller stated that the informant said he saw the hand-to-hand drug transactions and that the informant never bought drugs directly from the Jaguar's driver.

Deputy Miller testified that the confidential informant had no contact with the Jaguar's driver on May 16 and that the informant's information came from conversations between the informant and Ms. Long. Deputy Miller said that the informant had placed an order for one-half pound of marijuana, that Ms. Long told the informant she was "going to call my same guy, it's going to happen the way it always happens." Deputy Miller stated that the informant said the supplier would be an African-American man driving a four-door, silver Jaguar and that he would arrive during the evening hours. Deputy Miller agreed that the informant never identified the driver and that the informant never identified the Defendant. Deputy Miller said that officers corroborated the time frame, the car, and the male driver. Deputy Miller stated that the first time the informant described the Jaguar and the previous transactions was one or two days before May 16 and that on May 16, the informant called to tell Deputy Miller the sale had been arranged for later that day. Deputy Miller said that some years previously, the informant had been arrested and provided information to the police, that the informant had stopped providing information after the resolution of his case, and that the informant had been arrested on new charges and provided the information about the Jaguar in connection with the second arrest. Deputy Miller did not know when the informant's second arrest occurred but said it was shortly before May 16. Deputy Miller said that the informant had worked on "major investigation[s]" in Rutherford and Davidson Counties and had participated in several "pretty big busts" in Bedford County. Deputy Miller stated that the informant provided information leading to a traffic stop just before May 16, which resulted in the recovery of fifteen to twenty grams of methamphetamine. Deputy Miller said that in his experience, the informant's information had been reliable and accurate.

*Trial*

Deputy Miller's trial testimony was consistent with his testimony at the suppression hearing. He stated that on May 16, he drove an unmarked police car and that Agent George stopped a car driven by Ms. Long. Deputy Miller stated that he parked behind Agent George and asked him to bring Ms. Long to Deputy Miller's police cruiser, that Ms. Long walked toward Deputy Miller, and that Deputy Miller saw a silver four-door Jaguar drive past them. Deputy Miller said that he pulled out behind the Jaguar and activated his blue lights and later his siren, that the Jaguar did not stop, and that another unmarked police car joined the pursuit. He stated that the Jaguar maintained the same speed at first but gradually increased speed. He said that Tennessee State Highway Patrol Trooper Barry Qualls attempted to block the road in his vehicle, that the Jaguar, Deputy Miller, and Agent George drove around Trooper Qualls, and that Trooper Qualls activated his blue lights and siren and joined the pursuit.

Deputy Miller testified that during the pursuit, he and Trooper Qualls made "a number of attempts" to slow or stop the Jaguar by placing their police cruisers in front of it, that they had to "take evasive action" several times to avoid colliding with the Jaguar, and that the Jaguar attempted to "ram" the police cruisers when they were in his way.

-4-

Deputy Miller said that the vehicles traveled between sixty and seventy miles per hour, that they traveled onto a local highway, that three or four Bedford County Sheriff's Department police cruisers joined the pursuit, and that the vehicles eventually reached speeds of about ninety miles per hour. Deputy Miller stated that on one occasion, he went around the Jaguar and applied his brakes in order to slow the Jaguar and that the Jaguar "darted out into the oncoming traffic" and nearly caused a head-on collision with a civilian motorist. Deputy Miller said that after the incident, the officers did not attempt to slow the Jaguar by pulling in front of it and instead sought to stop it from behind. He agreed that the pursuit ended when the officers surrounded the Jaguar, forcing it to stop. Deputy Miller said that the Defendant was the driver, that he was removed forcibly from the Jaguar, and that one of the officers shocked the Defendant with a Taser. He stated that the pursuit spanned eleven miles.

Deputy Miller testified that he knew the Defendant and that the Defendant was the Jaguar's only occupant. Deputy Miller said that after the Defendant had been arrested, he saw a maroon backpack "in plain view" on the front passenger-side floorboard. Deputy Miller agreed that the backpack was easily observable and within arm's reach of the driver's seat and that nothing would have obstructed the driver's view of the backpack.

Photographs of the silver Jaguar were received as an exhibit. Deputy Miller testified that the photographs depicted the Jaguar and unmarked police cars as they appeared when the Defendant was stopped and the location of the maroon backpack. He said that he searched the backpack and found several one-gallon plastic bags containing marijuana, a loaded "Millennium" nine-millimeter pistol, and a dryer sheet. He stated that drug sellers used dryer sheets to mask the smell of marijuana. He said that the quantity of marijuana was much more than he expected to see for personal use and that in his experience, a person possessing that much marijuana intended to sell it. He stated that it was very rare for a marijuana user to carry a pistol.

Deputy Miller identified photographs of the backpack, marijuana, pistol, and dryer sheet, which were received as an exhibit. Deputy Miller stated that the multiple plastic bags indicated to him that the marijuana was packaged for sale. He said that he sent the marijuana to the Tennessee Bureau of Investigation (TBI) for testing and that the marijuana weighed a little less than 350 grams, which was about three-quarters of one pound.

On cross-examination, Deputy Miller testified that Agent Shane George stopped Ms. Long's car because he suspected a male passenger could have been her marijuana supplier. He agreed that he did not instruct Agent George to stop Ms. Long, that no contraband was recovered from Ms. Long, and that no scales were recovered from the silver Jaguar. Deputy Miller stated that he was uncertain but that it was possible a deputy looked inside the maroon backpack and saw marijuana before the backpack was photographed and removed from the Jaguar. He said, though, that he observed the

backpack continuously from the time of the Defendant's arrest. He stated that he was the first person to notice the bag on the floorboard, that he removed the bag from the car, and that he placed it and its contents on the hood of his police cruiser.

Deputy Miller testified that generally, drug transactions did not necessarily involve scales and that in this case, the marijuana had previously been weighed and packaged by the ounce, quarter pound, and half pound. He stated that in his experience, it was common not to recover scales and that each drug transaction was different because of the individuals involved. He said that he did not know Mr. Beales. Deputy Miller stated that he did not send the plastic bags for collection of fingerprint evidence, that it was "nearly impossible" to collect fingerprints from plastic bags, and that in fifteen years, he had never been involved in a case when fingerprints had been successfully recovered from plastic bags.

Seventeenth Judicial Drug Task Force Agent Shane George testified that on May 16, 2013, he conducted a traffic stop in connection with a marijuana investigation and that during the stop, a silver four-door Jaguar drove past him on the road. He said that Deputy Miller activated his blue lights and siren and followed the Jaguar in his unmarked police car and that Agent George activated his blue lights and siren and followed them in his unmarked police pickup truck. Agent George stated that at one point, he pulled alongside the Jaguar and saw that the Jaguar's driver had a clear view of the police vehicles behind him.

Agent George identified a video recording taken from his police pickup truck's camera, which was received as an exhibit and played for the jury. In the recording, two men stood next to a stopped car on a two-lane road. One of the officers wore a bulletproof vest, and the other wore a shirt marked "police" on the front and back. Blue lights reflected off of the back of the car. The man in the vest, presumably Agent George, walked to and entered the truck. A silver Jaguar sedan and a black car with its blue lights activated drove past the truck. Agent George followed the black car.

In the recording, the officers drove for several seconds before activating the black car's and the truck's sirens. The cars approached a marked state highway patrol vehicle, which was stopped in the middle of the two lanes with its blue lights and siren activated and faced the oncoming cars. The Jaguar, the black car, and the truck drove around the patrol car. The line of cars sped up, and eventually the cars turned right onto other two-lane roads Agent George identified in the recording as "Hilltop" and "Highway 82." The highway patrol vehicle and the black car attempted to box in the Jaguar multiple times, but the Jaguar swerved to avoid being trapped. The Jaguar nearly collided with the black car and the white truck on multiple occasions. In the process of avoiding the black car, the Jaguar entered the left lane and almost hit a civilian motorist, who had to swerve onto the shoulder to avoid a head-on collision. The vehicles passed multiple marked police cars with blue lights and sirens activated, as well as multiple civilian motorists, the

majority of whom had pulled over on the side of the road. A small black object was visible in the air, and it went under the truck. Agent George stated that the object appeared to be a cell phone and that it was "10-7." A marked police car traveling in the right lane pulled in front of the Jaguar and came to a stop beside two civilian trucks in the left lane. The white truck pulled over to the right side of the Jaguar, and the black car remained behind the Jaguar. All the vehicles came to a stop, shuffling was audible, and a voice said, "Get on the ground." The pursuit lasted about eleven minutes.

Agent George testified that in the recording, Deputy Miller had his blue lights activated, that Trooper Qualls had been traveling toward them from the opposite direction and had set up a roadblock, and that the Defendant drove around Trooper Qualls by going onto the shoulder. Agent George stated that about five minutes after the pursuit began, the Jaguar and the police vehicles sped up "dramatically." Agent George described several attempts to box in and slow the Jaguar. Agent George said that on one occasion, the Jaguar came within inches of his truck and that he had to "take evasive action" to avoid being hit. Agent George stated that on another occasion, Deputy Miller pulled in front of the Jaguar in an attempt to slow the Jaguar, the Jaguar pulled into the oncoming traffic lane, and the Jaguar nearly hit an oncoming motorist. Agent George said that after the near miss, the officers only attempted to slow the Jaguar from behind. He stated that the vehicles traveled between sixty and ninety miles per hour at varying intervals.

Agent George testified that he saw a cell phone on the road, that the cell phone went under his truck, and that he told the dispatcher the cell phone was likely broken. He said that he did not know from where the cell phone came and that it was possible it came from the Jaguar or had been on the side of the road and kicked up by one of the cars. He agreed that in the video recording, Deputy Miller commented over the radio that the driver of the Jaguar had thrown something out the window. Agent George stated that cell phones were valuable in drug investigations. Agent George said that eventually, the Jaguar was boxed in by police and civilian vehicles and that the Defendant was removed from the Jaguar.

On cross-examination, Agent George testified that before the chase, he stopped Ms. Long for ten to fifteen minutes and that he searched her car. He denied finding scales or large sums of money in Ms. Long's car. He stated that the Defendant had twenty dollars at the time of his arrest. Agent George did not know whether it was possible to obtain fingerprints from the pistol and said he was not familiar with fingerprinting. He was uncertain but did not think he sent the pistol for fingerprint analysis. He denied having sent items for fingerprint analysis in his fifteen years as a police officer.

Agent George testified that the Defendant's not having cash with him indicated that the Defendant had just purchased the marijuana he intended to resell. Agent George said that Ms. Long's lack of money was consistent with the information they received

during the investigation, which was that Ms. Long was a "middle person" and did not need to carry cash because the marijuana was intended for another buyer. Agent George stated that in his experience, some drug purchasers and distributors brought scales to a sale and some did not. He noted that if a drug supplier trusted a distributor, the supplier might give drugs to the distributor with the expectation of being paid once the drugs were sold. He agreed that if scales and money had been recovered, it would indicate the drugs were intended for resale. He denied, though, that an absence of scales and money would indicate no intent to sell the drugs. He said that the individual plastic bags of marijuana were not full, indicating that the marijuana had been weighed before it was packaged. He noted that the individual bags, the dryer sheet, and the pistol, which he stated was "for protection," indicated the existence of a drug transaction.

Agent George testified that the Defendant resisted the officers' attempt to extract him from the Jaguar and that he did not see what happened. Agent George stated that he thought Deputy Miller removed the backpack from the car, although he did not see it.

On redirect examination, Agent George testified that prior to stopping Ms. Long, he knew that the driver of a silver Jaguar was expected to deliver a large quantity of marijuana to a purchaser at Ms. Long's house and that Ms. Long allowed her house to be used for drug transactions. He said that the officers did not search Ms. Long's house.

TBI Special Agent Glen Glenn, an expert in forensic chemistry, testified that he tested the substance recovered from the Jaguar, that the substance was marijuana, and that it weighed 349.17 grams, or more than three-quarters of one pound.

The Defendant testified that on May 16, 2013, he drove on the road on which Ms. Long lived looking for a rental property on behalf of his sister. He said that he played loud music, that he did not see police vehicles behind him, and that eventually, he saw a state highway patrol vehicle on Highway 82 and realized the vehicles following him were police vehicles. He stated that he was afraid, that he did not know what was happening, and that he did not stop because it "looked like civilians" were trying to harm him. He said that he had about ten dollars, that he had borrowed the Jaguar from Mr. Beales to take it to a mechanic as a favor to Mr. Beales, that the mechanic was in Bedford County, and that Mr. Beales was at work during this time. The Defendant stated that he did not own a car and was not employed.

The Defendant testified that he never saw the maroon backpack before the officers removed it from the Jaguar and that he believed the backpack had been under the front passenger seat before becoming dislodged by "sporadic driving." He said that he did not look under the seats or in the trunk. He denied that he smelled marijuana in the car, that the marijuana was his, and that any of the backpack's contents belonged to him. He said that he knew Ms. Long through his sister but that he had never spent time with her, had dealings with her, bought drugs from her, or sold drugs to her. He denied driving on that

particular road in order to conduct a drug transaction with Ms. Long. He said that he was surprised when he realized the police were chasing him. The Defendant denied having scales or "baggies" during the incident. The Defendant did not know who removed the backpack from the car and did not remember Deputy Miller's showing him the backpack.

On cross-examination, the Defendant testified that he was on his way to look at the rental property and intended to go afterward to the mechanic, who was open until 5:00 p.m. He said that Mr. Beales and the Defendant had picked up the Jaguar from another city on May 15. The Defendant said that Mr. Beales was his roommate at the time and that the Defendant knew a Bedford County mechanic named "Darren" who owned the shop. The Defendant stated that he lived about thirty miles from Darren's shop.

The Defendant testified that on his way to the mechanic, he stopped by his sister's house, that his sister told him about a rental house in the area, that his sister described the house based upon a listing in the newspaper, and that he went to see the house for her. He said that he did not know where Ms. Long lived and that he passed four cars pulled over on the side of the road. He denied seeing blue lights or police vehicles. He stated that a black Dodge Charger and a white pickup truck began driving behind him, that he did not see any blue lights, and that he could not hear sirens because he had loud music playing. He stated later, though, that he did not remember whether he noticed any cars behind him. He said that the first time he realized police officers were attempting to stop him was when he was on Highway 82. He said later, though, that he saw a state trooper before he entered Highway 82. Relative to the trooper's attempting to block Bottle Hollow Road, the Defendant said that the vehicle was moving toward him, that the Defendant slowed down, and that he was afraid. He said later, though, that he did not recall encountering the vehicle or seeing blue lights.

Relative to the video recording, the Defendant agreed that the unmarked vehicles' blue lights were visible, and he said that he did not see them. Relative to one of the officers' wearing a shirt marked "Police," the Defendant said that the officer was turned away from the Defendant when he passed him. The Defendant stated that he was not wearing his eyeglasses that day. The Defendant stated that he began driving faster when he noticed the Dodge Charger chasing him. He noted that he only saw the Charger and did not see the pickup truck or state highway patrol vehicle. The Defendant stated that he eventually saw the state highway patrol vehicle and saw it had its blue lights activated. He agreed that he knew he was supposed to pull over and that he did not stop. He said that he was afraid and that he did not stop because they were in "the middle of nowhere." He agreed that in spite of the police vehicles' attempting to surround him, he did not stop. He stated that he did not go toward a particular destination and that he drove to get away from the officers.

The Defendant testified that he did not remember the "play-by-play" of events before he reached Highway 82 because of the passage of time. He said that he did not remember encountering police vehicles until he "came . . . head-on with" one. Relative to an incident in the recording when the Defendant drove around a stopped state trooper, the Defendant stated that it appeared he was trying to avoid a collision with the state trooper and that he did not stop. The Defendant said that he was afraid of law enforcement and ran from them if he felt uncomfortable. The Defendant stated that he never saw a white truck until he nearly hit the truck and that he did not know that the truck was a police vehicle. The Defendant said that he did not remember passing civilian motorists.

The Defendant testified that the Jaguar's catalytic converters were clogged and that the car could not travel faster than seventy miles per hour. Relative to the near head-on collision with a civilian, the Defendant said that he did not see the car before pulling in front of it. The Defendant denied throwing a cell phone out of the car and said he did not have a cell phone with him. The Defendant said that he stopped when he saw other people around, felt safe, and wanted to stop. He stated that he did not stop "in the country" because he was not safe there and wanted to be "in civilization with witnesses."

The Defendant testified that he had two sons and identified a photograph of one of his sons, which was received as an exhibit. He agreed that the photograph was found in the Jaguar tucked in the front side windshield. When asked how the photograph came to be in the Jaguar, the Defendant said that Mr. Beales was his son's godfather. The Defendant denied that he and Mr. Beales sold drugs. On redirect examination, the Defendant stated that the Defendant's sister did not give him the address of the rental property, that the Defendant's sister was "not from here," and that she described a white house with a brick base and a "for sale" sign in the yard.

Christina Long testified that on May 16, 2013, she was stopped by Agent George, that he searched her car, and that he did not find any drugs, money, or scales. She denied arranging to meet the Defendant as part of a drug transaction and being a middle person for drug transactions. She said that she and her boyfriend were on their way home from picking up her children at daycare. She stated that she contacted defense counsel and came to court voluntarily.

On cross-examination, Ms. Long testified that she knew the Defendant through his sister and that he had never been to Ms. Long's house. She stated that a white truck drove behind her and that she heard a siren and saw blue lights. She said that she was stopped between 5:30 and 6:00 p.m. because she had picked up her boyfriend from work and the daycare closed at 6:00 p.m. She agreed that she was stopped for ten or fifteen minutes. She said that the officers in a black car, a second car, and a white truck suddenly left, that she asked an officer what she was supposed to do because the officer had her driver's license, and that the officer responded she would have to come get it

later. She said that the officer instructed her to take her children away from the side of the road. She stated that the officer in the black car had asked to talk to her, that she had told the officer her name, and that the officer asked her to step out of the car. She agreed that she cooperated with the officers.

Ms. Long testified that Deputy Miller later called her and asked to meet with her and return her identification. She said, though, that she never met with him. She denied abandoning her cell phone in a gas station parking lot in order to be unreachable. She said that she could not explain why "some random person" told the police he found Ms. Long's cell phone in a parking lot. When asked what she thought would happen if she admitted under oath to allowing people to use her house to sell large quantities of marijuana, she stated, "I don't think much would happen now. It's been almost years, if I was guilty of that." She later said, though, that she would be in trouble if it had been thousands of dollars' worth of marijuana. She stated that she would not have allowed drugs around her children. She said that she would not admit to facilitating drug sales because it was not true and that if it were true, she would admit to it under oath even if she were subsequently arrested because "it would be the right thing to do."

Upon this evidence, the Defendant was convicted of evading arrest, reckless endangerment, possession of marijuana with the intent to sell, possession of marijuana with the intent to deliver, and employing a firearm during the commission of a dangerous felony. The Defendant was sentenced to serve four years for the evading arrest conviction, one year for the reckless endangerment conviction, one year for each possession of marijuana conviction, and three years for the possession of a firearm during the commission of a dangerous felony conviction. The trial court merged the possession of marijuana convictions and ordered concurrent service of the evading arrest and reckless endangerment sentences and consecutive service of the remaining sentences, for an effective sentence of eight years. This appeal followed.

## I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his marijuana and employing a firearm convictions, arguing that the evidence is not sufficient to prove that he possessed the marijuana and the handgun. The Defendant does not appeal his convictions for evading arrest and reckless endangerment. The State contends that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514,

521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

It is a crime to possess a controlled substance with the intent to deliver or to sell it. T.C.A. § 39-17-417(a)(4). Marijuana is a Schedule VI controlled substance. *Id*. § 39-17-415(a)(1) (Supp. 2012) (amended 2014, 2016). The possession of marijuana with the intent to sell or to deliver is a Class E felony if the amount involved is "not less than one-half (1/2) ounce (14.175 grams) nor more than ten pounds . . . (4535 grams)[.]" *Id*. § 39-17-417(g)(1) (Supp. 2012) (amended 2014).

Possession may be actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). Constructive possession requires a showing that a defendant had "the power and intention at a given time to exercise dominion and control over . . . [the item] either directly or through others." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (internal quotations and citation omitted). "'In essence, constructive possession is the ability to reduce an object to actual possession.'" *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting *United States v. Martinez*, 445 F.2d 495, 498 (5th Cir. 1979)). "Constructive possession depends on the totality of the circumstances in each case" and "may be proven by circumstantial evidence." *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013) (citing T.C.A. § 39-17-419 (2006)).

Constructive possession can be proven when contraband is accessible to a defendant who is located in the passenger compartment of a vehicle. For example, in *Robinson*, our supreme court found that the evidence was sufficient to support a conviction for possession of cocaine when the defendant, a passenger in a codefendant's truck, was within arm's reach of a bag of cocaine found inside and demonstrated knowledge of vocabulary used in the drug trade. *Robinson*, 400 S.W.3d at 534.

Tennessee Code Annotated section 39-17-1324(b)(1) proscribes possessing a firearm during the commission of a dangerous felony. Felony offenses "involving the . . . possession with intent to sell . . . or distribute a controlled substance" are enumerated dangerous felonies. *See id*. § 39-17-1324(i)(1)(L).

In the light most favorable to the State, the record reflects that the Defendant was the sole occupant of the silver Jaguar, that the maroon backpack containing the marijuana and pistol was on the front passenger-side floorboard in plain sight when the police stopped the Defendant, and that the backpack was easily accessible from the driver's seat. In addition, the Jaguar matched the description given by the confidential informant, and it appeared at the same location and time the officers expected a drug sale to take place. Agent George testified that the presence of a pistol was consistent with its being for protection in an anticipated drug sale. The jury, by its verdict, discredited the Defendant's assertion that he never saw the backpack and that it must have been placed under the front passenger seat and became dislodged as he drove the Jaguar. The evidence is sufficient for a rational jury to have found beyond a reasonable doubt that the Defendant had the power and intent to exercise control over the marijuana and the pistol. The evidence is also sufficient for a rational jury to have found beyond a reasonable doubt that the Defendant possessed the pistol during the commission of a dangerous felony, that being the possession of the marijuana with the intent to sell or deliver. The Defendant is not entitled to relief on this basis.

## II

### Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress the evidence obtained as a result of the traffic stop and the subsequent search of the car. He argues that (1) the information provided by the confidential informant did not provide probable cause to search the car pursuant to the automobile exception to the warrant requirement, (2) the arrest for reckless endangerment did not merit a search of the car incident to the arrest, and (3) an inventory search of the car was not justified. The State responds that the latter two issues have been waived and that the confidential informant's information was adequately corroborated and provided probable cause to search the car for marijuana.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at

the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

At the suppression hearing, the prosecutor argued that the automobile exception to the warrant requirement applied to the search of the Jaguar. The prosecutor noted that no dispute existed about the reliability of the confidential informant and said that defense counsel's objection pertained to Ms. Long's status as a citizen informant and the permissibility of the police's relying on Ms. Long's statements as "double hearsay." The prosecutor stated that the informant's tip contained sufficiently specific and corroborated information, including the location of the planned sale, the time frame, the type of vehicle, and the driver's being an African-American man. The prosecutor stated that based upon the corroborated information, the police had reasonable suspicion to stop the Defendant and investigate and that the mobility of the car authorized a warrantless search.

Defense counsel argued that in "*Aguilar-Spinelli*," the United States Supreme Court ruled that probable cause was not present when a confidential informant based his tip on what a member of the criminal milieu told him occurred in a house. Counsel stated that double hearsay was not sufficient to support a search warrant and that, as a result, double hearsay in the form of Ms. Long's statements about her supplier was not sufficient to support the officers' stopping the Jaguar. The prosecutor said that the informant saw the transaction between Ms. Long and the driver of the Jaguar and that this case was distinguishable from *Aguilar*.

The trial court denied the motion in a written order. The court found that the police had reasonable suspicion and probable cause to stop the Jaguar, that the search fell under the automobile exception because the mobility of the Jaguar created exigent circumstances, and that the reliability of the confidential informant was stipulated.

As a preliminary matter, the record reflects that the Defendant's motion to suppress and the suppression hearing only raised the propriety of the initial traffic stop, that is, the existence of reasonable suspicion or probable cause for Deputy Miller to activate his blue lights. Defense counsel noted at the suppression hearing that he did not challenge the subsequent search of the car. The latter two issues relative to the search of the car are raised for the first time on appeal and have been waived. *See* Tenn. R. Crim. P. 12(f) ("[A] party waives any defense, objection, or request by failing to comply with . . . rules requiring such matters to be raised pretrial[.]"), Tenn. R. Crim. P. 12(b) (stating that motions to suppress must be raised pretrial); *see also* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7.  Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

A law enforcement officer's initiating a traffic stop constitutes a seizure pursuant to the United States and Tennessee Constitutions.  *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *see Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also State v. Vineyard*, 958 S.W.2d 730, 734 (Tenn. 1997); *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993).  However, a police officer is permitted to initiate a traffic stop without a warrant for the purpose of a brief investigatory stop based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see Binnette*, 33 S.W.3d at 218.  The objective standard for determining whether a police officer has specific and articulable facts that a suspect has committed a crime or is about to commit a crime focuses on whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate[.]" *Terry*, 392 U.S. at 21-22 (internal quotation marks and citations omitted); *see State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003).

"Reasonable suspicion is a particularized . . . basis for suspecting the subject of a stop of criminal activity, and it is determined by considering the totality of the circumstances surrounding the stop." *Binette*, 33 S.W.3d at 218 (internal citations omitted).  This determination includes considerations relative to "'(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and experience.'" *Pulley*, 863 S.W.2d at 34 (quoting *United States v. Mendenhall*, 446 U.S. 544, 561 (1980) (Powell, J., concurring)).  The objective facts upon which the officer relied may include, but are not limited to, the officer's observations, information received from fellow officers, information received from citizens, and the "pattern of operation of certain offenders." *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).  "As a general rule . . . the stop of an automobile is constitutionally reasonable, under both the state and federal constitutions, if the police have probable cause or reasonable suspicion to believe that a traffic violation has occurred. *Vineyard*, 958 S.W.2d at 734 (citing *Whren*, 517 U.S. at 806).

The record reflects that at the time Deputy Miller activated his blue lights, a confidential informant had provided information that a silver, four-door Jaguar was expected to drive to Ms. Long's house in the evening hours of May 16, that the driver

would be an African-American man, and that the driver would have at least one-half pound of marijuana to sell the informant by way of Ms. Long. Defense counsel stipulated to the informant's reliability at the suppression hearing, and we note the informant's reliability was also established at the hearing. Deputy Miller testified that the informant had worked with police in multiple counties, that the informant's assistance resulted in several arrests and the recovery of significant quantities of controlled substances, and that the informant's information had always proven accurate and reliable. In addition, the Jaguar matched the description provided by the informant and appeared at the expected time and location. Deputy Miller's observations corroborated the informant's tip such that he had probable cause to believe a crime was being committed—the unlawful possession of a controlled substance. The record does not preponderate against the trial court's concluding that Deputy Miller had both reasonable suspicion and probable cause to stop the car the Defendant was driving. The Defendant is not entitled to relief on this basis.

## III

### *Batson* Challenge

The Defendant contends that the State improperly exercised a peremptory challenge to a prospective juror for a race-based reason, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1985). The Defendant argues that the prosecutor's stated reasoning for challenging a female African-American juror was not sufficient to establish a non-racial motive for striking the juror because other prospective jurors reported similar experiences and were not challenged by the State. The State responds that the Defendant "has failed to establish a prima facie case of purposeful discrimination . . . because the State had neutral and acceptable explanations for striking the potential jurors."[1]

In *Batson*, the United States Supreme Court held that the Equal Protection Clause prohibits the prosecution from excluding potential jurors based solely upon race. *Batson*, 476 U.S. at 89; *see Georgia v. McCollum*, 505 U.S. 42, 59 (1992) (extending the prohibition against race-based peremptory challenges to those challenges made by a defendant). When a party raises a *Batson* claim, the party must first establish a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 96. A defendant establishes

---

[1] We note that the State's argument implicates both the first and third portions of the *Batson* analysis. If the State's intent is to argue that the Defendant did not establish a prima facie case of discrimination because the trial court did not place a finding to that effect on the record, its argument is without merit because the prosecutor explained his reasoning to the court. *See Zakour v. UT Medical Group, Inc., & Scott Craig, M.D.*, 215 S.W.3d 763, 770 (Tenn. 2007) ("Because the Defendants explained their reasons for the peremptory challenges without prompting by the trial court . . . such a ruling [was not] necessary under the circumstances."). The Defendant's argument, which we address below, pertains only to the third portion of the *Batson* analysis, the court's determination relative to the credibility of the prosecutor's explanation.

a prima facie case of purposeful discrimination by showing that the State "excluded members of a cognizable racial group from the jury pool." *State v. Echols*, 382 S.W.3d 266, 281-82 (Tenn. 2012); *State v. Ellison*, 841 S.W.2d 824, 826 (Tenn. 1992); *see Powers v. Ohio*, 499 U.S. 400, 416 (1991). Second, the party who exercises the peremptory challenge is allowed the opportunity to rebut the prima facie showing by offering a race-neutral reason for its peremptory challenge. *Batson*, 476 U.S. at 97. Third, a trial court must determine whether the objecting party has established purposeful discrimination. *Id.*

A party's race-neutral explanation that merely consists of a denial of discriminatory motive or an assurance of good faith is insufficient. *See id.* Rather, the race-neutral reason must be "related to the particular case to be tried." *Id.* at 98. However, the explanation itself need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (internal quotation marks and citation omitted). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 768. In response to the race-neutral explanation, the trial court must examine and assess the plausibility of the explanation in light of all the evidence. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *see Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn. 1996). In this regard, the opponent of the peremptory challenge bears the burden of proving purposeful discrimination. *Purkett*, 514 U.S. at 768. A party may raise a Batson claim on behalf of a juror without the party's being part of the improperly excluded group. *See Powers*, 499 U.S. at 400; *see also Ellison*, 841 S.W.2d at 824. In making its determination,

> The trial [court] must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination. The trial court's factual findings are imperative in this context. On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous.

*Woodson*, 916 S.W.2d at 906; *see State v. Hugueley*, 185 S.W.3d 356, 374 (Tenn. 2006).

In *Miller-El*, the prosecutor challenged two African-American jurors because the prosecutor was concerned about the jurors' beliefs regarding the death penalty. 545 U.S. at 243. However, white panelists who had expressed similar views were not challenged. *Id.* at 244. The United States Supreme Court concluded, "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id.* at 241. The Court noted relative to the first juror,

[N]onblack jurors whose remarks on rehabilitation could well have signaled a limit on their willingness to impose a death sentence were not questioned further and drew no objection, but the prosecution expressed apprehension about a black juror's belief in the possibility of reformation even though he repeatedly stated his approval of the death penalty and testified that he could impose it . . . even when the alternative sentence of life imprisonment would give a defendant (like everyone else in the world) the opportunity to reform.

*Id*. at 245; *see Zakour* 215 S.W.3d at 770-71 (holding that a *Batson* violation occurred in a civil case when the defendants' reason for challenging an African-American juror was inconsistent with how they questioned other potential jurors and based upon incorrect information).

As a preliminary matter, we note that the Defendant challenges the proportionality of the jury venire, arguing that Bedford County is comprised of 8% African-American residents and that as a result, the presence of only one or two African-Americans in the venire of prospective jurors demonstrates systematic exclusion of African-Americans. *See Taylor v. Louisiana*, 419 U.S. 522, 527-28 (1975) (holding that a criminal defendant has a right to a venire of prospective jurors reflecting a "representative cross section of the community"); *see also State v. Hester*, 324 S.W.3d 1, 39 (Tenn. 2010), *superseded by statute on other grounds*. However, the Defendant has not provided the overall size of the jury pool, alleged that a practice of systematic exclusion exists, or established a statistical pattern of exclusion in other cases. *See Duren v. Missouri*, 439 U.S. 357, 366 (1979) (holding that a petitioner established a prima facie case of systematic exclusion of women from the jury venire where the petitioner showed a large discrepancy in the ratio of women to men "occurred not just occasionally but in every weekly venire for a period of nearly a year" and introduced "statistics and other evidence" to show when in the jury selection process the exclusion occurred). Although the Defendant raises allegations of discrimination based upon race in who is selected for a venire, he presents no evidence or information to support his allegations. Therefore, the record is insufficient for us to conclude whether a *Batson* violation occurred as a result of systemic practices in Bedford County, and the Defendant is not entitled to relief on this basis.

However, we conclude that the prosecutor improperly exercised a peremptory challenge. The record reflects that during voir dire, defense counsel asked the jury pool if anyone had a "relative or somebody that has had a drug problem." Ten prospective jurors answered affirmatively, specifying that drugs had affected "[s]omebody's child and mother," "a child of a cousin," "a brother," "a family member," "a couple of my family members," and "three family members." When asked whether their experiences prevented them from fairly evaluating the proof, the prospective jurors indicated their experiences would not impact their ability to evaluate the proof fairly, with the exception

of Juror L.,[2] who answered, "I don't think so." Juror S. answered that there had been a problem with drugs "[in] my family" and that nevertheless, she could fairly evaluate the proof.

The State exercised a peremptory challenge against Juror S., the only African-American member of the venire,[3] in the fifth round of challenges, and defense counsel requested a meeting in chambers. The trial court asked the prosecutor if he had a race-neutral reason for challenging Juror S. The prosecutor stated that Juror S. said she had "a family problem with drugs. That could be people that have used drugs; that could be people in the distribution of drugs." Defense counsel responded that his question did not involve drug distribution, that other prospective jurors indicated that they had family members or friends affected by drug use, that the prosecutor did not strike any similarly situated jurors, and that the proffered explanation was insufficient. The court concluded that the stated reason was race-neutral and that "the mere fact he hasn't challenged everybody who had a drug connection in their family doesn't mean he can't use that as a basis for this particular challenge."

The appellate review of this issue is frustrated by the parties' failure to identify the members of the venire. Four jurors who answered counsel's drug question affirmatively are identified in the voir dire transcript by name—Jurors K., L., Ly., and S.—and the remaining six jurors are only identified as "Juror," but the jurors' statements reflected in the transcript show they are distinct individuals. Because the jurors are not identified by name in the transcript, we cannot ascertain whether any of them were excused as a result of a peremptory challenge. We note, however, that defense counsel asserted during the in-chambers conference that the prosecutor had not exercised a peremptory challenge against any other juror who had answered the drug question affirmatively and that the prosecutor and the trial court did not dispute the statement. We also note that Juror K., who was excused as a result of a peremptory challenge, indicated that he knew someone affected by drug use, but the record does not reflect whether the peremptory challenge was exercised by counsel or by the prosecutor, and the record does not contain copies of the peremptory challenges.[4] We urge trial courts to make detailed findings when assessing a *Batson* challenge, which includes identifying jurors appropriately in the record for purposes of appellate review. *See State v. Hugueley*, 185 S.W.3d 356 (Tenn. 2006) (stating generally the need for trial courts to make findings at each stage of the *Batson* analysis).

---

[2] We abbreviate the names of the prospective jurors out of consideration for their privacy.

[3] The trial court said relative to African-American jury members in the venire, "I think there is another woman out there," but no one commented further.

[4] We note that the Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g., State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983).

In any event, the record reflects that the prosecutor excused the only prospective African-American juror, that the trial court asked for a race-neutral explanation, and that the prosecutor did not dispute the allegation that he did not challenge other jurors for the reason he challenged Juror S. The prosecutor's explanation for challenging Juror S. was not consistent with his treatment of other similarly situated jurors. Jurors L. and Ly. were not challenged in spite of their experiences with a "drug problem," and we note that Juror L. did not answer unequivocally when asked whether Juror L.'s experience with drugs would prevent fair consideration of the Defendant's case. Last, counsel's question was whether anyone the jurors knew had a "drug problem," which generally would not implicate drug distribution. Nevertheless, the prosecutor said that he challenged Juror S. because her answer indicated her family could be involved in the use *or distribution* of drugs, which the record does not support. These circumstances make the credibility of the prosecutor's explanation questionable, at best, and we conclude that the court's determination that in light of all the evidence, the explanation was plausible was clearly erroneous. *See Woodson*, 916 S.W.2d at 906.

The existence of a single improperly challenged juror is grounds for relief under *Batson*. *Zakour*, 215 S.W.3d at 771 (citing *J.E.B. v. Alabama*, 511 U.S. 127 (1994)). Because the trial court gave the prosecutor an opportunity to explain his reasoning during jury selection, we need not remand the case for a more detailed hearing, and the proper remedy is a new trial. *State v. Spratt*, 31 S.W.3d 587, 598 (Tenn. Crim. App. 2000); *see* T.R.A.P. 36(b) (stating that relief may be granted when an error would "result in prejudice to the judicial process.").

## IV

### Identity of Confidential Informant

The Defendant contends that the trial court erred by declining to order the prosecutor to disclose the identity of the confidential informant. The Defendant argues that the informant's identity was material to preparing his defense. The State responds that the Defendant did not make any such request before the trial and that as a result, the issue is waived.

In the amended motion for a new trial and at the motion for a new trial hearing, defense counsel argued that the identity of the confidential informant was exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). However, on appeal, the Defendant argues the issue is based upon the standard expressed in *State v. Vanderford*, 980 S.W.2d 3990 (Tenn. Crim. App. 1997). The Defendant may not argue a different basis for relief for the first time on appeal. *See* T.R.A.P. 36(a) (stating that "relief may not be granted in contravention of the province of the trier of fact.").

In any event, the record does not reflect that the Defendant filed a pretrial motion to compel the disclosure of the confidential informant's identity or that he made an oral request at a hearing. The amended motion for a new trial states, "At the [suppression hearing] . . . [o]ver objection of the Defense, the Trial Court did not compel the State to produce the identity of the confidential informant, nor did the State disclose any such evidence." However, the record does not reflect that such an objection was made at the suppression hearing. In addition, the record does not reflect any discovery motions were filed. Because the record reflects that no issue relative to the informant's identity was raised before or during the trial, this issue has been waived. *See* T.R.A.P. 36(a).

## V

### Double Jeopardy

The Defendant contends that the trial court erred by failing to merge Count 1, evading arrest, with Count 2, reckless endangerment. The Defendant argues that this court concluded that dual convictions for these offenses were not permissible in *State v. Jimmy Lee Cullop, Jr.*, No. E2000-00095-CCA-R3-CD, 2001 WL 378543 (Tenn. Crim. App. Apr. 17, 2001), *no perm. app. filed*. The State responds that dual convictions for these offenses are permissible due to our supreme court's opinion in *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012).

The Fifth Amendment of United States Constitution and Article I, section 10 of the Tennessee Constitution provide that no person should be put "in jeopardy of life or limb" twice for the same offense. U.S. Const. amend. V, Tenn. Const. art. I, § 10. Double jeopardy principles proscribe multiple punishments for the same conduct. *See State v. Watkins*, 362 S.W.3d 530, 541-42 (Tenn. 2012).

In *Watkins*, our supreme court abandoned the analysis provided previously in *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996), and adopted the "same elements" analysis delineated by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Therefore, whether dual convictions violate double jeopardy principles requires a determination of "whether the convictions arise from the same act or transaction." *Watkins*, 362 S.W.3d at 557. If the convictions arise from the same act or transaction, the second inquiry is whether the elements of the offenses are the same or whether one offense is a lesser included offense of the other. *Id*. If the elements are the same or one offense is a lesser included offense of the other, dual convictions violate double jeopardy principles. *Id*. Appellate courts "will presume that multiple convictions are not intended by the General Assembly" when the elements of the offenses are the same or when one offense is a lesser included offense of the other. *Id*.

We note that in *Jimmy Lee Cullop, Jr.*, this court's conclusion that dual convictions for Class D felony evading arrest and reckless endangerment violated

principles of double jeopardy was based upon the *Denton* "same evidence" test, which was abrogated by *Watkins* and *Cross*. *See Cross*, 362 S.W.3d at 519; *Watkins*, 362 S.W.3d at 557. The facts of the present case are substantially similar to the facts in *Cross*, which also involved a high-speed chase. *Cross*, 362 S.W.3d at 515. In *Cross*, our supreme court concluded that dual convictions for Class D felony evading arrest and Class E felony reckless endangerment did not violate principles of double jeopardy because each offense required elements the other did not. *Id*. at 519. The record reflects that the Defendant was charged with and convicted of Class D felony evading arrest and Class E felony reckless endangerment. Accordingly, we conclude that the trial court did not err by declining to merge the Defendant's convictions for evading arrest and reckless endangerment. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we conclude that the Defendant is entitled to a new trial based upon the State's improper use of a peremptory challenge in violation of *Batson*. The judgments of the trial court are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
ROBERT H. MONTGOMERY, JR., JUDGE